IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re OPENWAVE SYSTEMS INC.<br>SHAREHOLDER DERIVATIVE LITIGATION<br><br>_____/ | No. C 06-03468 SI<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTION TO DISMISS** |

On April 27, 2007, the Court heard argument on nominal defendant's motion to dismiss for failure to make pre-suit litigation demand, named defendants' motion to dismiss for failure to state a claim, and nominal defendant's motion for a temporary discovery stay. Having considered the arguments of the parties and the papers submitted, and for good cause shown, the Court rules as follows.

## BACKGROUND[1]

Nominal defendant Openwave Systems, Inc. is a leading provider of open-standards software products and services for communications and media companies. Openwave is incorporated in Delaware and its principal place of business is in Redwood City, California. At the time plaintiffs filed this action, Openwave's Board of Directors consisted of six directors: Openwave's CEO, David Peterschmidt, and non-management directors Kenneth Denman, Bo Hedfors, Gerald Held, Masood Jabbar, and Bernard Puckett. The named defendants in this case include these six directors, along with 12 other current and former Openwave officers and directors.

---

[1] The following background facts are taken from the allegations of plaintiffs' Consolidated Verified Shareholders Derivative Complaint ("Complaint"), which for purposes of this motion, must be taken as true.

Named plaintiffs Henry Sherupski and Manfred Hacker are shareholders of Openwave. Plaintiffs allege that from 2000 to 2006, defendants engaged in a scheme whereby defendants granted and/or received backdated Openwave stock option grants. Defendants granted the backdated stock options under the company's "Stock Option Plans" which required the Board of Directors, or a designated Committee, to determine the exercise price of each option grant within certain limitations. One of the limitations was that stock option grants could not have an exercise price less than the fair market value of a share of Openwave common stock on the date of grant. The 1995 and 1996 Stock Option Plans were administered by the Board's Compensation Committee. At various points between 2000 and 2005 defendants Denman, Puckett, Hedfors, and Verhalen served on the Compensation Committee. The 1999 Stock Option Plan was administered by the entire Board.

Plaintiffs allege that despite the exercise price requirements of the Stock Option Plans, defendants granted backdated stock options with "strike prices" below the fair market price on the date granted. Defendants attempted to hide this backdating scheme from shareholders and the public and issued materially false and misleading financial statements and Proxy Statements.

In May 2006 Openwave revealed that it had received a Letter of Inquiry from the SEC regarding its stock option practices. On July 5, 2006, Openwave revealed that the United States Attorneys for the Eastern District of New York and the Northern District of California were investigating its stock option practices. On October 4, 2006, Openwave announced that an internal investigation had discovered irregularities in stock option grants between 2005 and 2006, which would require a restatement of financial results. On December 1, 2006, Openwave announced that "the measurement dates for financial accounting purposes for a number of stock option grants differed from the recorded grant dates for such awards." Complaint ¶ 108. Along with this announcement, Openwave issued restated financial results, taking a $182 million charge for stock-based compensation.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. The question presented by a motion to dismiss is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer

2

evidence in support of the claim. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scherer*, 468 U.S. 183 (1984).

In answering this question, the Court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). Even if the face of the pleadings suggests that the chance of recovery is remote, the Court must allow the plaintiff to develop the case at this stage of the proceedings. *See United States v. City of Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981).

If the Court dismisses the complaint, it must then decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (citations and internal quotation marks omitted).

## DISCUSSION

### I. Demand futility

Nominal-defendant Openwave moves the Court to dismiss this action for plaintiffs' failure to make a pre-suit litigation demand. Plaintiffs respond that they have sufficiently pled demand futility under Delaware law.

Federal Rule of Civil Procedure 23.1 provides, in pertinent part, that in a derivative action brought by shareholders, the complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." According to the Ninth Circuit, pursuant to Rule 23.1:

> A shareholder seeking to vindicate the interests of a corporation through a derivative suit must first demand action from the corporation's directors or plead with particularity the reasons why such demand would have been futile. Rule 23.1, however, does not establish the circumstances under which demand would be futile. For these standards, we turn to the law of the state of incorporation; in this instance, Delaware. To show futility under Delaware law, a plaintiff must allege particularized facts creating a reasonable doubt that (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.

3

*In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 989-90 (9th Cir. 1999) (citing *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) for the two prong test; other citations omitted). The two prong *Aronson* test is disjunctive. "If a derivative plaintiff can demonstrate a reasonable doubt as to the first or second prong of the *Aronson* test, then he has demonstrated that demand would have been futile." *Seminaris v. Landa*, 662 A.2d 1350, 1354 (Del. Ch. 1995).

"Where there is no conscious decision by directors to act or refrain from acting," the second prong of the *Aronson* rule is not at issue, and the courts inquire whether the complaint raises "a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).

"A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders. Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Rales v. Blasband*, 634 A.2d 927 (Del. 1993) (citing *Aronson*). "[T]he mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." *Aronson*, 473 A.2d at 815.

In *Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. Feb. 6, 2007) the Delaware Court of Chancery addressed a complaint alleging a stock option backdating scheme similar to the one alleged here. In *Ryan*, the plaintiff alleged that at Maxim Integrated Products, Inc., "nine specific grants were backdated between 1998 and 2002, as these grants seem too fortuitously timed to be explained as simple coincidence. All nine grants were dated on unusually low (if not the lowest) trading days of the years in question, or on days immediately before sharp increases in the market price of the company." *Id.* at 346. In addition to the fortuitous timing of the nine grants, the complaint in *Ryan* presented the results of an analysis by Merrill Lynch which "looked at annualized stock price returns for the twenty day period subsequent to options pricing in comparison to stock price returns for the calendar year in which the options were granted." *Id.* at 346-47 . "With regard to Maxim, Merrill Lynch found that the

twenty-day return on option grants to management averaged 14% over the five-year period, an annualized return of 243%, or almost ten times higher than the 29% annualized market returns in the same period." *Id.* at 347.

The defendants in *Ryan* moved to dismiss or stay the action on several grounds, including a failure to plead demand futility with particularity. *See id.* at 348. With respect to demand futility, the court ruled as follows:

> Maxim's board consisted of six members at all relevant times. The compensation committee, at all relevant times, consisted solely of three members, Bergman, Wazzan, and Hagopian. Thus, one half of the current board members approved each challenged transaction. Where at least one half or more of the board in place at the time the complaint was filed approved the underlying challenged transactions, which approval may be imputed to the entire board for purposes of proving demand futility, the *Aronson* test applies.

*Id.* at 353.

Applying *Aronson*, the court found that demand was futile under the second prong, as plaintiffs had raised "a reason to doubt whether the challenged transactions were a valid exercise of business judgment." *Id.* at 354. Specifically, the court held:

> Plaintiff supports his claim that backdating occurred by pointing to nine option grants over a six-year period where each option was granted during a low point. That is, every challenged option grant occurred during the lowest market price of the month or year in which it was granted. In addition to pointing specifically to highly suspicious timing, plaintiff further supports his allegations with empirical evidence suggesting that backdating occurred. The Merrill Lynch analysis measured the extent to which stock price performance subsequent to options pricing events diverged from stock price performance over a longer period of time to measure the aggressiveness of the timing of option grants and found that Maxim's average annualized return of 243% on option grants to management was almost ten times higher than the 29% annualized market returns in the same period. This timing, by my judgment and by support of empirical data, seems too fortuitous to be mere coincidence. The appearance of impropriety grows even more when one considers the fact that the board granted options, not at set or designated times, but by a sporadic method.
>
> Plaintiff supports his breach of fiduciary duty claim and his assertion that demand is futile by pointing to the board's decision to ignore limitations set out in the company's stock options plans. The plans do not grant the board discretion to alter the exercise price by falsifying the date on which options were granted. Thus, the alleged facts suggest that the director defendants violated an express provision of two option plans and exceeded the shareholders' grant of express authority.
>
> Plaintiff here points to specific grants, specific language in option plans, specific public disclosures, and supporting empirical analysis to allege knowing and purposeful violations of shareholder plans and intentionally fraudulent public disclosures. Such facts, in my opinion, provide sufficient particularity in the pleading to survive a motion to dismiss for failure to make demand pursuant to Rule 23.1.

5

*Id.* at 354-55.

The court also held that, even under the *Rales* test, or the first prong of *Aronson*, the plaintiffs had adequately pled demand futility. Applying the "substantial likelihood" of potential liability test, the court found that:

> A director who approves the backdating of options faces at the very least a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty. Backdating options qualifies as one of those "rare cases [in which] a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists." Plaintiff alleges that three members of a board *approved* backdated options, and another board member accepted them. These are sufficient allegations to raise a reason to doubt the disinterestedness of the current board and to suggest that they are incapable of impartially considering demand.

*Id.* at 355-56 (quoting *Aronson*, 473 A.2d at 815) (emphasis in original).

The facts alleged in plaintiffs' Complaint in this case are somewhat analogous to the facts of *Ryan*. As discussed, plaintiff here allege that at the time plaintiffs filed this action, Openwave's Board of Directors consisted of six directors: Peterschmidt, Denman, Hedfors, Held, Jabbar, and Puckett. Plaintiffs also allege that three of the directors, Puckett, Hedfors and Denman, were members of the Compensation Committee during the period when the Compensation Committee granted backdated stock options. *See* Complaint ¶¶ 23, 25, 26, 84, 86, 89. Thus, as in *Ryan*, here "one half of the current board members approved" at least some of the "challenged transaction[s]." *Ryan*, 918 A.2d 353. Therefore, the Court agrees with plaintiffs that this "approval may be imputed to the entire board for purposes of proving demand futility, [and] the *Aronson* test applies." *Id.*

Also as in *Ryan*, plaintiffs here argue that their backdating claims are sufficiently supported by two types of allegations: (1) allegations of specific, fortuitously-timed option grants; and (2) an "analysis measur[ing] the extent to which stock price performance subsequent to options pricing events diverged from stock price performance over a longer period of time." *Id.* at 354. Paragraphs 6, and 57 through 69 of the Complaint, allege in great detail how 21 stock option grants made by or to defendants between 2001 and 2005 "were granted at or near the lowest closing price for the month and/or fiscal quarter." Complaint ¶ 69. Paragraphs 57 through 69 also provide calculations of the 20-day cumulative returns for each of the 21 questionable option grants.

6

While plaintiffs' allegations mirror those in *Ryan*, there are some differences. The most glaring difference is that plaintiffs' Complaint here does not specify whether the 21 questionable option grants identified in the Complaint represent all of the option grants to directors and top officers during the years at issue, or whether they were only a small fraction of the total option grants. In the latter case, without something more, it is equally likely that the 21 identified option grants fell at or near low points simply by chance, rather than design. Defendants assert in their briefs that this is the case – that "the option grants that Plaintiffs challenge constitute . . . less than 5 percent of the total number of options that Openwave granted during the relevant period." Named Defs.' Reply at 4:13-15. If this is true, then plaintiffs' identification of the 21 option grants simply does not, alone, indicate backdating. Two courts of this district have recently come to similar conclusions. In *In re CNET Networks, Inc. Shareholder Derivative Litig.*, — F. Supp. 2d —, 2007 WL 1089690, at *11 (N.D. Cal. April 11, 2007), Judge Alsup stated: "[P]laintiffs here rely on pointing out instances where options were granted at a periodic low point in stock price, followed by an increase. They do not plead any facts as to when any other options were granted, or under what circumstances they were granted." Even more pointedly, in *In re Linear Tehnology Corp. Deriv. Litig.*, No. C 06-3290 MMC (N.D. Cal. Dec. 7, 2006), Judge Chesney held that:

> With respect to the allegation of "backdating," the only factual allegation offered by plaintiffs is that on seven occasions over a period of seven years, stock options were dated "just after a sharp drop" in Linear's stock and "just before a substantial rise," which, plaintiffs allege, constitutes a "striking pattern that could not have been the result of chance." Because plaintiffs provide no facts as to how often and at what times the Committee Defendants have granted stock options in the past, no "pattern," let alone a "striking" one, is apparent.

*Id.* at *3 (citations omitted).

At oral argument, however, the parties here clarified that while the accused option grants represent only a small fraction of the total options granted during the period, they represent a much larger fraction of the total number of *reported* options granted during the period. Plaintiffs identified the 21 accused option grants using proxy statements and publicly available SEC filings. At hearing, the parties agreed that there were only a total of approximately 36 option grants reported in the proxy statements and publicly available SEC filings during the period. Because the precise number was unclear, the Court ordered the parties to identify and report the precise number of total option grants reported in the proxy statements and SEC filings during the period. On May 7, 2007, defendants filed

7

1  a response stating that the SEC filings during the relevant period identified 98 option grants on 41
2  different stock option grant dates. Plaintiffs filed a submission stating that they have been unable to
3  verify two of the 41 option grant dates identified by defendants. The parties thus appear to agree that
4  during the relevant period, Openwave publicly reported approximately 40 different dates on which it
5  granted stock options.

6        The 21 option grants identified by plaintiffs in the Complaint fell on 12 different dates. The
7  Complaint thus alleges that 12 of the approximately 40 reported stock option grant dates fell at
8  suspiciously low stock prices. This smaller number of *reported* option grants is the appropriate
9  reference set for two reasons. First, only grants to directors and certain upper-level officers must be
10 reported to the SEC. Grants to directors and upper-level officers are more problematic than grants to
11 ordinary employees because they are more likely to implicate conflicts of interest and affect a board's
12 impartiality. Second, the number of reported option grants is the relevant reference set because
13 plaintiffs cannot be expected to have, pre-discovery, enough information to allege, with particularity,
14 that non-reported option grants were backdated. The Court therefore must decide whether, under *Ryan*,
15 an allegation that 12 of approximately 40 reported stock option grant dates fell at or near low points is
16 sufficient.[2]

17       Defendants also contend, however, that for several of the 12 option grant dates, Openwave
18 disclosed the grants within two days on SEC Forms 4. *See* Gupta Decl., Exs. 26, 33-42. For those
19 grants, therefore, the maximum by which defendants could have backdated was two days. In response
20 to this issue, plaintiffs argue that (1) it would be improper for the Court to take judicial notice of the
21 SEC disclosures, and (2) "defendants['] contentions regarding the [SEC] Forms 4 epitomize a
22 quintessential factual argument inappropriate for disposition on a motion to dismiss." Oppo. at 17:21-
23 23. The Court disagrees with plaintiffs, and finds that the SEC Forms 4 are judicially noticeable, and
24 somewhat diminish the ability to infer backdating from the allegations of plaintiffs' Complaint, at least

---

26      [2]As discussed, in *Ryan* the plaintiffs' complaint identified 9 suspicious option grants. The
opinion in *Ryan* gives no indication of how many total options were granted during the relevant period.
27  Plaintiffs in this case represented at hearing that the 9 option grants at issue in *Ryan* were all of the
grants reported by in the proxy statements during the relevant period. If this is true, then *Ryan* supports
28  this Court's use of reported option grants as the appropriate analytical set.

8

1   with respect to some of the reported options.

2   "[F]acts subject to judicial notice may be considered on a motion to dismiss." *Mullis v. United*
3   *States Bankr. Court*, 828 F.2d 1385, 1388 (9th Cir. 1987). "In a securities action, a court may take
4   judicial notice of public filings when adjudicating a motion to dismiss a complaint for failure to state
5   a claim upon which relief can be granted." *In re Calpine Corp.*, 288 F. Supp. 2d 1054, 1076 (N.D. Cal.
6   2003) (citing *In re Nuko Information Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 341 (N.D. Cal. 2000) (citing
7   *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999), and *MGIC Indem. Corp. v.*
8   *Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)); *see also Dreiling v. American Exp. Co.*, 458 F.3d 942,
9   946 n.2 (9th Cir. 2006) ("We review de novo a dismissal under Rule 12(b)(6), and may consider
10  documents referred to in the complaint or any matter subject to judicial notice, such as SEC filings.")
11  (citations omitted); *see also Parrino v. FHP Inc.*, 146 F.3d 699, 706 (9th Cir. 1988) ("We therefore hold
12  that a district court ruling on a motion to dismiss may consider a document the authenticity of which
13  is not contested, and upon which the plaintiff's complaint necessarily relies."); *In re Silicon Graphics*
14  *Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (the court may consider SEC filings relied upon in
15  the complaint); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996); *Kramer v.*
16  *Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

17  The Court therefore GRANTS defendants' request for judicial notice of the fact that Openwave
18  filed Forms 4 with the SEC disclosing many of the option grants at issue within two business days of
19  the stated date of the option grants. Openwave began disclosing the option grants to the SEC in Forms
20  4 starting with the October 10, 2002 grant. Therefore, for five of the twelve option grant dates alleged
21  by plaintiffs, defendants timely filed Forms 4.[3] For those five dates, absent allegations that defendants
22  also backdated the Forms 4, defendants could only have backdated the options by two days, at the most.
23  It appears on the face of the Complaint that for two of those five dates, the stock price declined in the
24  two days following the grants. *See* Complaint ¶ 64 (May 6, 2004 grants); ¶ 67 (November 2, 2004
25  grants). The options granted on those two days therefore could not have been backdated. For the
26  remainder of those five dates, however, it appears that the stock price increased in the two days

---

28  [3]Defendants do not provide a Form 4 related to the August 13, 2004 grant to defendant Wilkinson.

9

following the grants. *See* Complaint ¶ 63 (October 10, 2002); ¶ 66 (October 4, 2004); ¶ 68 (October 13, 2005). Backdating stock options by two days is still backdating. These three grant dates may therefore still support plaintiffs' claims, despite the filing of Forms 4 within two days of the grants.

Discounting the two grant dates for which defendants filed Forms 4, and after which the stock price declined, the Complaint alleges that 10 out of approximately 38 reported stock option grant dates fell at or near low points. More specifically, two fell at monthly lows (January 8, 2001 and July 20, 2001), one fell at a quarterly low (October 10, 2002), and the seven remaining dates fell on "one of the lowest monthly closing prices." Complaint ¶ 6. As defendants point out, "the odds of a grant occurring *randomly* at the lowest price in a month is 1 in 21.67 (the average number of trading days in a month)." Named Defs.' Reply at 4 n.3. Thus, when looking at a set of approximately 40 randomly-granted stock options, one would expect approximately two to fall on the lowest price of any given month. The odds of granting an option on "one of the lowest monthly closing prices," would obviously depend on how one defines "one of the lowest." For example, if that phrase means "one of the five lowest" of the approximately 20 trading day prices, then the odds of a randomly selected option date falling on one of those dates would be approximately one in four. In such case, in a set of 40 options, one would expect 10 to fall on "one of the lowest" monthly dates.[4] In light of these simple probabilities, plaintiffs' Complaint does not, in its current form, allege facts sufficient to support an inference of backdating. The fact that, in a set of 40 option grants, two fell on monthly lows, one fell on a quarterly low, and seven fell on "one of the lowest" monthly prices, is as consistent with a random selection of stock option grant dates, as with a pattern of backdating.

The Court does not conclude that the facts contained in plaintiffs' Complaint are inconsistent with an inference of backdating. At this point, however, the Complaint does not resemble the analytical picture presented to the court in *Ryan*.

Plaintiffs' "20 day trading analysis" is also far less informative than that presented by the plaintiffs in *Ryan*. As discussed above, in *Ryan* the plaintiffs included in their complaint an analysis which "measured the extent to which stock price performance subsequent to options pricing events

---

[4] A sophisticated statistical analysis must also take into account the Form 4 issue, and the fact that some of the options could only have been backdated by a maximum of two days.

10

diverged from stock price performance over a longer period of time to measure the aggressiveness of the timing of option grants and found that Maxim's average annualized return of 243% on option grants to management was almost ten times higher than the 29% annualized market returns in the same period." 918 A.2d at 347. Here, the Complaint presents the 20-day cumulative returns for each of the 21 questionable option grants, but does not compare them to any benchmarks. Plaintiffs purport to present such an analysis in their Opposition, stating that their "20 trading day analysis . . . . revealed striking patterns of stock option grants with significant 20 day returns that far outstripped Openwave's overall performance." Oppo. at 7:23-25. Even plaintiffs' analysis in opposition, however, does not compare the average 20 day return on *all* reported stock option grants during the relevant period to the average 20 day return on Openwave stock during the period. Instead, plaintiffs simply compare the 20 day return on the 21 particular, handpicked option grants to the average Openwave stock performance. *See* Oppo. at 7-8. Plaintiffs' "20 trading day analysis" therefore suffers from the same flaw as plaintiffs' identification of the 21 supposedly-questionable option grants. Plaintiffs' analysis therefore does not support a reasonable inference of backdating. *See In re CNET*, — F. Supp. 2d —, 2007 WL 1089690, at *10 ("Sound analytical methods are one way that plaintiffs could have eliminated the possibility that the returns from the grants were the product of dumb luck. Without them, that inference is more difficult to support.").

For the foregoing reasons, plaintiffs' Complaint fails to plead sufficient facts to avoid Rule 23.1's demand requirements. Plaintiffs' allegations and statistical analyses are simply insufficient, at this point, to allow a reasonable inference of backdating and thus of demand futility. Leave to amend will be granted in order to allow plaintiffs the opportunity to conduct and present a more comprehensive statistical analysis, or other allegations supporting an inference of backdating, should they wish to do so.

## II. Defendants' motion to stay discovery

Defendants also move to stay all discovery unless and until plaintiffs successfully comply with Rule 23.1 and successfully state a claim for relief. Defendants argue that such a stay is warranted under both Delaware law, and the Private Securities Litigation Reform Act ("PSLRA").

The Ninth Circuit has not addressed whether discovery must be stayed in a derivative action that has failed to surpass a Rule 23.1 challenge. It appears undisputed that under Delaware law, "derivative plaintiffs are not entitled to discovery in order to demonstrate demand futility." *Beam v. Stewart*, 845 A.2d 1040, 1056 (Del. 2004); *see also Rales v. Blasband*, 634 A.2d 927, 934 n.10 (Del. 1993) ("Although derivative plaintiffs may believe it is difficult to meet the particularization requirement of *Aronson* because they are not entitled to discovery to assist their compliance with Rule 23.1, they have many avenues available to obtain information bearing on the subject of their claims.") (citation omitted). Plaintiffs respond that "[w]hile Delaware and a few other states have adopted such a rule, this consolidated derivative action is pending in federal court where the Federal Rules of Civil Procedure govern the initiation and conduct of discovery." Oppo. at 4:13-15.

The Court is not convinced that Delaware's discovery rules should apply to this case. Federal courts must look to Delaware law to determine whether demand would be futile for purposes of Rule 23.1. There is no authority for the proposition, however, that federal courts must also follow Delaware's related discovery rules.

Defendants also argue that the automatic discovery stay provided for in the PSLRA applies to this case. Plaintiffs respond that the PSLRA discovery stay applies only to private class actions arising under the federal securities laws, and not to derivative actions. The PSLRA provides, in pertinent part:

> Stay of discovery. In any private action arising under this title [15 USCS §§ 78a et seq.], all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. § 78u-4(b)(3)(B). Again, there is no authority establishing whether "any private action" includes derivative actions. The few courts that have applied this clause of the PSLRA to derivative actions have primarily done so where the action also includes a class action security fraud claim. *See e.g.*, *Shoberg v. ClearMediaOne, Inc.*, 2006 WL 3316834, at *1 (S.D. Tex. Oct. 18, 2006). Recently, however, two courts from this district have applied the PSLRA discovery stay to derivative actions that do not include class claims. In *Melzer v. CNET Networks, Inc.*, 2006 WL 3716477 (N.D. Cal. Dec. 15, 2006), Judge Alsup also failed to find any analogous, published authority. Nonetheless, largely on the basis of unpublished opinions from other districts, Judge Alsup determined that the PSLRA discovery

12

stay should apply to derivative actions that include federal securities fraud claims. *See id.* at *2; *see also In re Altera Corp. Derivative Litigation*, 2006 WL 2917578, at *1 (N.D. Cal. Oct. 11, 2006) (same); *but see Gunther v. Tomasetta*, No. 2:06-cv-02529-R, slip op. at 1 (C.D. Cal. Oct. 2, 2006) (without discussion, denying motion to stay discovery pending resolution of Rule 23.1 motion in a derivative action).

The closest published case cited by the parties on these issues is from the Southern District of New York. In *In re First Bancorp Derivative Litigation*, 407 F. Supp. 2d 585 (S.D.N.Y. 2006), the court addressed a motion to stay discovery for the time "necessary to resolve defendant['s] proposed motion under Rule 23.1," to dismiss plaintiffs' state law derivative actions. *Id.* at 585. The court first held: "While the case law on the interplay between the PSLRA automatic stay and discovery in state law derivative actions is less than perfectly consistent, on the whole federal courts have refused to stay discovery in derivative actions brought independently of parallel securities fraud class actions." *Id.* at 586 (citing cases). The court continued: "separate derivative actions are not automatically subject to the discovery stay of the PSLRA and . . . such actions, not being subject to many of the class action abuses at which the PSLRA was especially directed, do not usually warrant such a stay." *Id.* (citing case). Nonetheless, the court concluded that:

> Whether [the Rule 23.1] requirements are, as they facially appear, procedural in nature, or whether, as [defendant] here argues, they adopt by reference certain substantive requirements of state law, the very existence of this special rule bears testament to Congress' concern that derivative actions -- in which individual shareholders seek, in effect, to speak for the corporation -- may often partake of their own special abuses and therefore ought to be subject to early scrutiny by the courts. Accordingly, whether or not required to do so by state law implications, the Court believes that in cases such as the instant ones, it is appropriate for the Court, in the exercise of its discretion, to stay discovery for the short time necessary to hear and decide a motion to dismiss under Rule 23.1.

*Id.* at 586-87.

This Court agrees with the court in *In re First Bancorp* that Rule 23.1 reflects a Congressional intent that derivative actions pass certain hurdles before being allowed to proceed with the normal course of litigation, including discovery. The Court therefore GRANTS defendants' motion to stay discovery until such time as plaintiffs are able to meet the requirements of Rule 23.1.

13

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS nominal defendant's motion to dismiss for failure to comply with Rule 23.1, with leave to amend. Named defendants' motion to dismiss is likewise GRANTED on this one basis only. Plaintiffs must file an amended complaint on or before June 22, 2007, should they wish to do so. The Court GRANTS defendants' motion to temporarily stay discovery.

**IT IS SO ORDERED.**

Dated: May 17, 2007

SUSAN ILLSTON
United States District Judge